**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**

**VERSUS**

**SHELVIN GRAY**

**CRIMINAL ACTION**

**NO. 23-105-JWD-RLB**

## RULING AND ORDER

This matter comes before the Court on the *Motion to Dismiss Count Two of the Indictment and Stay of the Proceedings* ("*Motion to Dismiss*") (Doc. 17) filed by Defendant Shelvin Gray ("Defendant"). The Court stayed this matter pending the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. 680 (2024), (Doc. 18), and pending the Fifth Circuit's decision in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), (Docs. 22, 24). Following the decisions in those cases, the Government filed its *United States Memorandum in Opposition to Defendant's Motion to Dismiss* ("*Gov. Opposition*") (Doc. 31). Defendant then filed his *Response to the United States' Memorandum in Opposition to Defendant's Motion to Dismiss* ("*Def. Response*") (Doc. 36). The Government filed the *United States' Reply to Defendant's Response to United States' Memorandum in Opposition to Defendant's Motion to Dismiss* ("*Gov. Reply*") (Doc. 37). The Court ordered the parties to file briefing on the impact of its ruling in *United States v. Davis*, No. 22-93, 2025 WL 964439 (M.D. La. Mar. 31, 2025) (deGravelles, J.) Defendant accordingly filed his *Brief Regarding Impact of Court's Ruling in United States v. Davis* ("*Def. Brief*") (Doc. 39), and the Government filed *United States' Response to Defendant's Brief Regarding Impact of Court's Rulings in United States v. Davis* ("*Gov. Brief*") (Doc. 40).

Oral argument was scheduled for August 20, 2025, but the Court finds that it is no longer necessary. The Court has carefully considered the law, the facts in the record, and the arguments

1

and submissions of the parties, and it is prepared to rule. For the following reasons, Defendant's *Motion to Dismiss* is denied.

## I.    RELEVANT BACKGROUND AND PARTIES' ARGUMENTS

Defendant was indicted on December 6, 2023, on one count of Possession of a Machinegun in violation of Title 18 U.S.C. § 922(o) and one count of Possession of a Firearm by a Convicted Felon in violation of Title 18 U.S.C. § 922(g)(1). (Doc. 1 at 1.) Relevant to Count Two, Defendant has a prior conviction for aggravated criminal damage to property from 2020 and a prior conviction for illegal use of weapons from 2020. (Doc. 17-1 at 2; Doc. 31 at 6.)

On January 1, 2024, Defendant moved to dismiss Count Two, arguing that Title 18 U.S.C. § 922(g)(1) violated the Second Amendment as interpreted by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). (Doc. 17-1 at 1.) He argued that § 922(g)(1) was unconstitutional both facially and as applied to him. (*Id.* at 3–8.) The Court stayed the matter pending a decision in *Rahimi*, 602 U.S. 680, and again pending the Fifth Circuit's decision in *Diaz*, 116 F.4th 458.

On September 18, 2024, the Fifth Circuit held in *Diaz* that § 922(g)(1) is constitutional both facially and as applied to Diaz. *Diaz*, 116 F.4th at 472.  The Government then filed *Gov. Opposition*, arguing that *Bruen*, *Rahimi*, *Diaz*, and *United States v. Bullock*, 123 F.4th 183 (5th Cir. 2024), all support the constitutionality of § 922(g)(1). (Doc. 31 at 3–5.) The Government argues that the Fifth Circuit wrongly decided the first step of the *Bruen* analysis in *Diaz* and that "the pre-existing right to keep and bear arms codified in the Second Amendment's text is not available to felons." (*Id.* at 5–6.) Next, it argues that the Fifth Circuit rightly decided the second step of the *Bruen* analysis in *Diaz*, such that Defendant's facial challenge is foreclosed and his as-applied challenge is meritless. (*Id.* at 6.) The Government argues that "because founding-era governments

punished analogous crimes with death, estate forfeiture, or firearms forfeiture, the disarmament of defendant is permissible." (*Id.*) First, with respect to criminal damage to property, the Government contends that it is "a crime similar to arson," which "was a common-law felony subject to punishment by death." (*Id.* at 6–7 (citing 4 William Blackstone, *Commentaries on the Laws of England*, 94–98, 221–223 (1769); Henry John Stephen, *Summary of the Criminal Law*, 92–93 (1840)).) The Government presents numerous founding era statutes punishing arson with death. (*Id.* at 7 (collecting statutes).)

The Government then addresses Defendant's prior conviction for "illegal use of weapons or dangerous instrumentalities from a motor vehicle on a public street or highway in violation of La. R.S. 14:94." (*Id.*) The Government compares this conviction to "the founding-era offense of going armed." (*Id.* at 8 (citing *Rahimi*, 602 at 697–98).) The Government contends that, "[a]s explained by the Supreme Court in *Rahimi*, in England, 'the going armed laws prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land."''" (*Id.* (quoting *Rahimi*, 602 U.S. at 697 (quoting Blackstone, *supra*, at 149)) (alterations made in *Gov. Opposition*).) The Government provides multiple founding era statutes that likewise prohibited going armed. (*Id.* (collecting statutes).) It argues that this is sufficiently analogous to illegal use of weapons to justify disarming Defendant under § 922(g)(1). (*Id.*)

In addition, the Government points to what it argues is the country's historical tradition of disarming those deemed dangerous. (*Id.* at 8–9.) It again points to the going armed laws discussed in *Rahimi*, arguing that § 922(g)(1) is similarly designed to disarm those who pose a threat of "dangerousness." (*Id.* at 9.) The Government contends that "[t]he facts underlying defendant's convictions for aggravated criminal damage to property and illegal use of a firearm demonstrate that he is dangerous." (*Id.*) It also argues that "'the justification behind going armed laws, to

3

"mitigate demonstrated threats of physical violence," supports a tradition of disarming individuals like [defendant] pursuant to § 922(g)(1), whose underlying convictions stemmed from the threat and commission of violence with a firearm.'" (*Id.* at 10 (quoting *Bullock*, 123 F.4th at 185 (quoting *Rahimi*, 602 U.S. at 698)).) The Government further argues that the burden imposed in this instance is "consistent with history and tradition." (*Id.*)

In *Def. Response*, Defendant maintains that his as-applied challenge is not foreclosed by *Diaz*. (Doc. 36 at 3.) Instead, he contends that he is protected by the Second Amendment and that his prior convictions do not have historical analogues that would prevent him from possessing a firearm under *Bruen*. (*Id.* at 4–5.) Defendant argues that his prior convictions for Aggravated Criminal Damage to Property and Illegal Use of Weapons are not analogous to founding-era felonies. (*Id.* at 5.)

First, Defendant contests the specific charge under which he was convicted for Illegal Use of Weapons; while the bill of information under which he pled refers to "illegal use of weapons or dangerous instrumentalities from a motor vehicle on a public street or highway[,]" he argues that the statute referenced in the bill of information and the amount of time to which he was sentenced implies that he was only "convicted of the lesser offense of illegal use of weapons or dangerous instrumentalities, not for discharging the same from a motor vehicle." (*Id.* at 6.) In either case, Defendant argues, this does not satisfy *Diaz*. (*Id.*) Defendant argues that the Fifth Circuit has not found § 922(g)(1) constitutional as to statutes analogous to founding-era going armed laws. (*Id.* at 9–10.) Instead, he contends, these were merely illustrative examples in a case about another set of circumstances altogether. (*Id.* at 10 (citing *Diaz*, 116 F.4th at 467–70).) Defendant argues that these examples were used "*only* to address the 'how' of felon disarmament, but not the 'why.'" (*Id.*) He

4

asserts that there is no historical analogue to support both the how and why for disarming someone convicted for illegal use of weapons. (*Id.*)

With respect to his prior conviction for Aggravated Criminal Damage to Property, Defendant argues that the Government has failed to provide sufficient historical analogues to support disarming him based on this predicate offense. (*Id.* at 6–7.) Defendant contends that this is not, in fact, a similar crime to arson. (*Id.* at 7.) He points to the elements of arson at the time of the founding, which included the requirement that "the thing must actually have burned." (*Id.* at 8.) In contrast, Defendant argues that the destruction of property under La. R.S. 14:55 "cannot be done by 'fire.'" (*Id.*) Furthermore, Defendant cites to the same commentary that the Government relies upon to argue that, in the founding era, a person who shot at a house with a gun and unintentionally set fire to the thatch would not be guilty of arson. (*Id.*) He contrasts this, again, with his own actions of "shooting a house with a gun and the house *not* catching on fire[.]" (*Id.*) Defendant argues that to find founding-era arson statutes analogous to Aggravated Criminal Damage to Property "requires this Court to read the laws [] at such a high level of generality to water down the Second Amendment[,]" which he cautions "is exactly what *Bruen* warned against[.]" (*Id.*) Defendant claims that the Government, having found no historical analogues, "has instead resorted to the type of boundless analogical reasoning that *Bruen* prohibits." (*Id.* at 9.)

Finally, Defendant argues that the Government has not shown that Defendant fits into the "dangerousness" requirement as outlined by the Supreme Court in *Rahimi*. (*Id.* at 12–13 (citing *Rahimi*, 602 U.S. at 698)).) Defendant argues that *Rahimi* permitted disarmament where there was "a prior judicial determination of dangerousness linked to temporary disarmament[,]" which he argues is not the same as the permanent disarmament following a felony conviction set forth in § 922(g)(1). (*Id.* at 13.) He argues that the Court should consider only his prior felony convictions,

5

rather than all past conduct. (*Id.* at 14–15.) Defendant claims that if he were dangerous based on his prior conduct, state judicial officials would not have "agree[d] that an appropriate punishment was a one-year sentence i.e., a time served sentence." (*Id.* at 16.) Defendant argues that the Court should therefore dismiss Count Two of the indictment.

In *Gov. Reply*, the Government argues that the Court should not be too rigid in its consideration of historical analogues. (Doc. 37 at 1.) It urges the Court to accept its argument that "aggravated criminal damage to property is similar to arson, except that it is not committed with fire." (*Id.* at 2.) The Government argues that "[b]oth involve the intentional damaging of property—one by fire and one by other means." (*Id.*) It also argues that it has provided sufficient historical analogues for illegal use of a firearm that support disarmament. (*Id.*) The Government emphasizes that the historical analogues need only "result[] in *disarmament*, not necessarily death." (*Id.* (quoting *Diaz*, 116 F.4th at 467).) It again points to historical going armed laws. (*Id.* at 3.) The Government points to an unpublished Fifth Circuit opinion affirming disarmament where the predicate offense was aggravated assault with a deadly weapon, arguing that the rationale there supports reliance on going armed laws. (*Id.* at 4 (citing *United States v. Isaac*, No. 24-50112, 2024 WL 4835243 (5th Cir. Nov. 20, 2024)).) The Government then argues that Defendant can be disarmed if he is considered a danger, which the Government asserts is not the same as merely irresponsible. (*Id.* at 5–6.) It also asserts that the *Rahimi* Court did not require a prior determination of danger for permanent disarmament, and that the Fifth Circuit has since "held that the burden imposed by the permanent disarmament effected by Section 922(g)(1) is relevantly similar to historical laws providing for capital punishment and permanent arms forfeiture." (*Id.* at 6 (citing *Diaz*, 116 F.4th at 469–71).) Furthermore, the Government argues, "there *are* judicial findings in this case that defendant threatened others with a firearm." (*Id.*) The Government contends that the

Fifth Circuit looks to the conduct underlying defendants' predicate convictions, and the Court should likewise do so here. (*Id.* at 7.) It asserts that the facts in the record for Defendant's predicate state convictions "manifestly establish that he is dangerous." (*Id.*)

The parties each then filed briefs on the impacts of *United States v. Davis* to this matter. Defendant argues that *Davis* does not have any impact on his *Motion to Dismiss* because, unlike the defendant in *Davis*, he "has no prior convictions for drug trafficking and drug possession." (Doc. 39 at 4.) Instead, he argues, his prior convictions are for offenses for which the Government has not presented relevantly similar historical analogues. (*Id.*) Consequently, Defendant urges the Court to grant his *Motion to Dismiss*. (*Id.* at 5.)

In contrast, the Government argues that "the public-safety rationale used by the Court in *Davis* supports application of Section 922(g)(1) to the defendant." (Doc. 40 at 2.) The Government points to the Court's reasoning in upholding the application of § 922(g)(1) where "predicate convictions 'carrie[d] a risk of violence.'" (*Id.* at 3 (citing *Davis*, 2025 WL 964439, at *7).) It argues that Defendant's predicate offenses "establish that the defendant poses a danger to society." (*Id.*) As a result, the Government asserts, "*Davis* thus supports the constitutionality of the statute as applied to the defendant." (*Id.*)

## II.    LEGAL STANDARDS

### A.    The Second Amendment Generally

The felon-in-possession statute makes it a crime for:

> any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year[,] . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

7

Because § 922(g) affects the Second Amendment right to "keep and bear Arms[,]" the Court must conduct a Second Amendment analysis to determine the constitutionality of its application. *Diaz*, 116 F.4th at 462.

The Supreme Court established the Second Amendment standard in *Bruen*:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 24 (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961)). "This historical inquiry that courts must conduct will often involve reasoning by analogy . . . ." *Id.* at 28. The question of "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28–29 (citing C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). This involves finding "a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30.

In *United States v. Rahimi*, the Supreme Court further clarified the "historical analogue" requirement. 602 U.S. at 691. "These precedents were not meant to suggest a law trapped in amber." *Id.* "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. The Court found that 18 U.S.C. 922(g)(8) was constitutional on its face and as applied to *Rahimi*, because our country's "firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 690.

The Fifth Circuit applied this framework to § 922(g)(1) in *Diaz*. 116 F.4th 458. *Diaz*

considered the defendant's felon status in the second step of the *Bruen* analysis, collapsing the inquiry "into one question: whether the law is consistent with our Nation's history of firearm regulation." *Id.* at 467 (citing *Rahimi*, 602 U.S. at 692). The Fifth Circuit held "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1) . . . ." *Id.* Thus, the government bears the burden to demonstrate that the application of § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." *Id.* (quoting *Bruen*, 597 U.S. at 24) (internal quotation marks omitted).

To determine if a historical law is relevantly similar, the Fifth Circuit has said to focus "on the *why* and *how* [and] ascertain whether the challenged regulation 'impose[s] a comparable burden on the right of armed self-defense' to that imposed by a historically recognized regulation." *United States v. Quiroz*, 125 F.4th 713, 718 (5th Cir. 2025) (quoting *Bruen*, 597 U.S. at 29). In *Diaz*, the Fifth Circuit held that § 922(g)(1)'s justification (the "why") was "relevantly similar" to the examples of punishing felonies with death: "to deter violence and lawlessness." *Diaz*, 116 F.4th at 469. The Fifth Circuit also reasoned that the method by which § 922(g)(1) reaches this goal (the "how")—permanent disarmament—was consistent with historical methods because if felonies were historically punished with death, "then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." *Id.*

The holding in *Diaz* was not a blanket statement that all felonies may serve as a constitutional predicate offense to § 922(g)(1), but only those that "fit[] within this tradition of serious and permanent punishment[,]" such as death or permanent estate forfeiture. *Id.* at 470. *Diaz* addressed a predicate conviction of theft, finding that there was a history and tradition of severe punishment for theft by looking to the historic laws of three states: Massachusetts, New York, and Virginia. *Id.* at 468. Further, the Fifth Circuit found that the historical "going armed" and forfeiture

of weapons laws, which "punished 'those who had menaced others with firearms'[,] . . . provide[d] for permanent arms forfeiture as a penalty." *Id.* at 470–71 (citing *Rahimi*, 602 U.S. at 697; Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 53). "Imposing permanent disarmament as a punishment is also within our Nation's history and tradition." *Id.* at 471. The Fifth Circuit held that "taken together, laws authorizing severe punishments for thievery and permanent disarmament in other cases establish that our tradition of firearm regulation supports the application of § 922(g)(1) to Diaz." *Id.*

Likewise, in *United States v. Bullock*, the Fifth Circuit rejected a § 922(g)(1) challenge by a defendant with prior convictions for aggravated assault and manslaughter. 123 F.4th 183, 184–85 (5th Cir. 2024). "From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Id.* at 185 (quoting *Rahimi*, 602 U.S. at 693). "The historical record demonstrates 'that legislatures have the power to prohibit dangerous people from possessing guns.'" *Id.* (quoting *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting)); *see also Folajtar v. Att'y Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) ("The historical touchstone is danger[.]")). The Fifth Circuit reasoned that "[t]here can be no doubt that manslaughter and aggravated assault in this context constitute dangerous and violent crimes." *Id.* (citation omitted). The appellate court looked to the "historical tradition of severely punishing individuals convicted of homicide, a prototypical common law felony considered a 'very dangerous offense[, ]'" *id.* (citation omitted), and to the fact that the defendant's conduct was "'relevantly similar' to, and arguably more dangerous than, the 'prototypical affray [which] involved fighting in public,' the precursor to the 'going armed' laws punishable by arms forfeiture," *id.* (quoting *Rahimi*, 602 U.S. at 697).

More recently, in *Quiroz*, the Fifth Circuit addressed 18 U.S.C. § 922(n), possession of a

firearm while under indictment for a felony. 125 F.4th at 715. Quiroz was under indictment for

burglary and bail jumping. *Id.* The Fifth Circuit analyzed the history of burglary as a capital

offense, finding a tradition because seven states at the founding deemed burglary a capital offense.

*Id.* at 724. It further said that there need not be unanimity between the states to show history and

tradition. *Id.* at 725.

Ultimately, neither the Supreme Court nor the Fifth Circuit has set a minimum number of

historic laws required to establish a history and tradition of serious and permanent punishment. In

*Diaz*, the Fifth Circuit found a history and tradition looking at the laws of only three states. 116

F.4th at 468. In *Quiroz*, again, it was seven. 125 F.4th at 724. Thus, it appears that there is no

brightline rule for determining how many states' laws are needed to establish a tradition, but *Diaz*

and *Quiroz* provide guidance.

**III.    DISCUSSION**

The Fifth Circuit has not specifically addressed either of Defendant's predicate convictions

in relation to § 922(g)(1). However, with respect to Illegal Use of a Weapon, the Fifth Circuit has

found the founding era "going armed laws" are sufficient historical analogues to § 922((q)(2)(A),

which limits where individuals are permitted to carry firearms, *United States v. Allam*, 140 F.4th

289, 297 (5th Cir. 2025), and to § 922(g)(1), *Diaz*, 116 F.4th at 471. Likewise, multiple other

district court judges in the Fifth Circuit have accepted the Government's argument that founding

era going armed statues are sufficient historical analogues to La. R.S. 14:94. *United States v. Office*,

2024 WL 4965628 (W.D. La. Dec. 3, 2024) (S. Maurice Hicks, Jr., J.) (finding "a sufficient

historical analogue between La. R.S. § 14:94 and going armed laws[]"); *United States v. Johnson*,

2024 WL 5130859 (W.D. La. Dec. 16, 2024) ( Donald E. Walter, J.) (finding, in motion to vacate

under 28 U.S.C. § 2255, that "[b]oth the 'going armed' statutes and the Louisiana illegal use of a

weapon statute target the improper use of weapons to 'deter violence and lawlessness,' and they do so in the same way: permanent disarmament[]" (quoting *Diaz*, 116 F.4th at 469 (cleaned up))).

The Government here points to English common law at the time of the founding, which it argues "prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land.'" (Doc. 31 at 8 (quoting *Rahimi*, 602 U.S. at 697 (quoting Blackstone, *supra*, at 149)).) At common law, this was punishable "upon pain of forfeiture of the arms, and imprisonment during the king's pleasure[.]" Blackstone, *supra*, at 149. The Government also points to statutes of early American governments that likewise punished going armed with "permanent arms forfeiture." (Doc. 31 at 8 (quoting *Diaz*, 116 F.4th at 471; citing *Rahimi*, 602 U.S. at 697).) Indeed, the Supreme Court in *Rahimi* explicitly stated that "at least four States—Massachusetts, New Hampshire, North Carolina, and Virginia—expressly codified prohibitions on going armed." *Rahimi*, 602 U.S. at 698 (citing 1786 Va. Acts ch. 21; 2 Laws of the Commonwealth of Massachusetts from Nov. 28, 1780 to Feb. 28, 1807, pp. 652-653 (1807); Acts and Laws of His Majesty's Province of New-Hampshire in New-England 2 (1761); Collection of All of the Public Acts of Assembly, of the Province of North-Carolina: Now in Force and Use 131 (1751) (1741 statute)). In examining these founding era statutes, the Supreme Court stated "[t]aken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* Likewise, the Fifth Circuit has found that going armed laws are sufficient historical analogues to modern statutes that prohibit carrying firearms in certain locations such as schools, *Allam*, 140 F.4th at 297–98, and to § 922(g)(1) itself, *Diaz*, 116 F.4th at 471. It has additionally found that going armed laws support disarming individuals with prior convictions for aggravated assault and manslaughter. *See Bullock*, 123 F.4th 183 (5th Cir. 2024); *United States v. Schnur*, 132 F.4th 863

(5th Cir. 2025); *Isaac*, 2024 WL 4835243.

Going armed laws are, perhaps, even more similar to Louisiana's Illegal Use of a Weapon statute than they are to any of these other statutes. La. R.S. 14:94(A) prohibits "the intentional or criminally negligent discharging of any firearm, or the throwing, placing, or other use of any article, liquid, or substance, where it is foreseeable that it may result in death or great bodily harm to a human being." La. R.S. 14:94(A). La. R.S. 14:94(E) prohibits "discharging a firearm from a motor vehicle located upon a public street or highway, where the intent is to injure, harm, or frighten another human being[.]" La. R.S. 14:94(E). While Defendant's record does not clearly state the subsection under which he was charged, the bill of information clearly echoes the language of La. R.S. 14:94(E): "on or about June 26, 2020, the defendant intentionally discharged a firearm in a place where it was foreseeable that it might have resulted in death or great bodily harm to a human being *from a motor vehicle on a public street or highway*[.]" (Doc. 31-1 at 1.) As in the going armed laws, this statute includes the carrying of deadly weapons, in a public space, with the intent to frighten or injure. *See* Blackstone, *supra*, at 148–49. Given the determinations of the Supreme Court and Fifth Circuit in other cases involving violent offenses, the Court has no difficulty in finding that Louisiana's Illegal Use of a Weapon statute is consistent with both the historical "why"—prohibiting intentional violence with deadly weapons in public places—and "how"—with permanent disarmament—of founding era going armed laws.

On the other hand, the Government's attempt to analogize Louisiana's Aggravated Criminal Damage to Property statute to founding era arson laws is somewhat less convincing. The Government does not provide any cases that support such an analogy, (*see* Doc. 31 at 6–7), nor is the Court able to find any. Indeed, as Defendant points out, the elements of the offenses are not clearly parallel. (Doc. 36 at 7–8.) Common law arson required "the malicious and wilful [sic]

13

burning of the house or outhouses of another man." Blackstone, *supra*, at 220. It was "an offense

against th[e] right[] of habitation," *id.*, required that the building "absolutely *burns*," *id.* at 222,

and required that "it must be a *malicious* burning[,]" *id.* In contrast, La. R.S. 14:55 "is the

intentional damaging of any structure, watercraft, or movable, wherein it is foreseeable that human

life might be endangered, by any means other than fire or explosion." La. R.S. 14:55(A). Both,

certainly, involve intentional damage to a structure—but that is where the similarities end.

Common law arson (and those founding era arson statutes that incorporated it) necessitated fire,

destroying a habitation. Blackstone, *supra*, at 220–222. La. R.S. 14:55 involves any intentional

damage to any structure *except* by fire or explosion. La. R.S. 14:55(A).

Similar to common law arson, New York at the time of the founding made "willfully

burning any dwelling house, or any barn[]" a felony punishable by death. Act of Feb. 21, 1788, ch.

37, 1788 New York Laws, 11th Sess., 1st Mtg. 665. Likewise, Massachusetts penalized any person

who "between sun setting and sun rising, willfully and maliciously shall burn the dwelling house

of another, or any out building by means of which a dwelling house shall be burnt[]" with death.

Act of Mar. 11, 1785, ch. 58, 1785 Mass. Acts & Laws, Jan. Sess. 157. Those who committed such

a crime during the day, or to buildings other than dwelling houses, were sentenced to lesser

punishments. *Id.* In the Northwest Territories in the same time period, the punishment for "willfully

and maliciously burn[ing], or caus[ing] to be burned[] . . . any dwelling-house, store-house, barn,

stable, or other building thereto[]" was death. Act of Dec. 19, 1799, ch. 39, Laws of the Territory

of the United States, North-West of the River Ohio (1800). Finally, in the Mississippi Territory,

anyone found guilty of "wil[l]fully and maliciously burn[ing], or caus[ing] to be burnt[] . . . any

Dwelling house or other building thereunto adjoining . . . shall be deemed Guilty of ARSON, and

upon conviction thereof, shall suffer Death[.]" Historical Records Survey. *Sargent's Code: A*

*Collection of the Original Laws of the Mississippi Territory Enacted 1799-1800 by Governor Winthrop Sargent and the Territorial Judges*, p. 162 (1939). All of these require willfulness or maliciousness, all include the element of burning, and all of them reference dwelling houses or associated buildings.

However, as the Supreme Court has emphasized, "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). The Court looks, again, to the "why" and "how" of La. R.S. 14:55, asking whether those are consistent with common law. La. R.S. 14:55 prohibits intentional damage to any property "wherein it is foreseeable that human life might be endangered[.]" La. R.S. 14:55(A). This comports with the intent requirement in founding-era statutes. Likewise, Louisiana's statutory requirement that it be "foreseeable that human life might be endangered[]" comports with the "dwelling-house" element of founding era arson statutes: both focus on the risk to human life associated with the intentional damage to the property. The key difference, then, is whether that damage must occur via fire—and this element does not have a crucial bearing on the "why" of La. R.S. 14:55, which is to prevent intentional damage to property where human life is at risk as a result. La. R.S. 14:55(A). This is largely consistent with the "why" of common law and founding era arson statutes, which sought to prevent the intentional damage of property likely to be occupied via a particularly dangerous and destructive means. *See* Blackstone, *supra* at 148–49. At a broader level, it meets the "why" articulated by the Fifth Circuit in *Diaz*: "to deter violence and lawlessness." *Diaz*, 116 F.4th at 469. In addition, the "how" is consistent with the Fifth Circuit's ruling in *Diaz*: since arson was historically punishable with

15

death, "the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." *Id.*

Finally, the Court notes that another district court in the Fifth Circuit has previously found that going armed laws are sufficient historical analogues to La. R.S. 14:55. *United States v. Debrow*, 2025 WL 449816 at *3 (W.D. La. Feb. 10, 2025). It found that "the purpose behind the establishment of these laws is the same: to protect the public by keeping firearms out of the hands of individuals who seek to do harm to others." *Id.*

Based on Supreme Court and Fifth Circuit precedent, as well as its own analysis of the founding era analogues, the Court finds that § 922(g)(1) is constitutional both on its face and as applied to Defendant.

**IV.    CONCLUSION**

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss Count Two of the Indictment and Stay of the Proceedings* (Doc. 17) filed by Defendant Shelvin Gray is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>July 15, 2025</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**